The OKLAHOMA CITY, a Municipal
Corporation, Petitioner,

v.

Garland FAIN and the State Industrial
Court, Respondents.

No. 47039.

Supreme Court of Oklahoma.

Nov. 26, 1974.

Rehearing Denied Feb. 25, 1975.

Walter M. Powell, Municipal Counselor by R. Thomas Lay, Asst. Municipal Counselor, Oklahoma City, for petitioner.

Lampkin, Wolfe, Burger, Abel, McCaffrey & Norman, by George J. McCaffrey, Oklahoma City, for respondent, Garland Fain.

Larry Derryberry, Atty. Gen. of State of Oklahoma, Oklahoma City, for respondent, The State Industrial Court.

BARNES, Justice:

Beginning in November, 1955, Garland Fain, hereinafter referred to by name, or as "claimant", was employed approximately 18 years in Oklahoma City's Fire Depart-

ment. In April, 1973, when he was approximately 46 years old, his employer, for reasons immaterial to this case, gave him the choice of resigning or being fired. On the 24th day of that month, he resigned.

Thereafter, on July 12, 1973, Fain filed a Form 3 in the State Industrial Court claiming permanent disability from an accidental heart injury he allegedly suffered while fighting a fire at an Oklahoma City apartment house on January 2, 1973.

In its answer to this claim, Oklahoma City, hereinafter referred to as "respondent", denied that claimant suffered the accidental injury he claimed, and also alleged that it was prejudiced in defending the claim by Fain's failure to give notice of such injury within 30 days after it allegedly occurred.

After an October, 1973, trial, at which the only evidence introduced was claimant's testimony and two physicians' reports, the Trial Tribunal entered its order finding claimant suffered a myocardial infarction in the course of his hazardous occupation on January 2, 1973, and that, as a result thereof, he was permanently and totally disabled, for which disability his award was the total sum of $25,000.00. In the order, claimant's failure to give respondent written notice of the injury was excused "for the reason that the Claimant did not know of his injury during the thirty-day statutory period, and Respondent was not prejudiced by said failure . . . " to give the notice.

On appeal to the Industrial Court, en banc, that court sustained the award after amending the Trial Tribunal's previous order by excusing claimant's failure to give the written notice on the ground that respondent was not prejudiced because it had actual notice "of the accident . . . "

In this original proceeding to review the award, respondent contends that the evidence as a whole, and particularly the medical, is insufficient to show that claimant's heart condition, myocardial infarction, was caused by an accidental injury claimant received in the course of his employment on January 2, 1973, as he claimed, and the Industrial Court found.

A review of the record shows claimant testified, inter alia, that on the day of his claimed accidental injury, his principal regular duties in the City's Fire Department consisted of accompanying the District Fire Chief to fires as his chauffeur, helping said Chief investigate the cause of such fires, determine whether or not there was insurance on the property involved, and evaluate the damages thereto, as well as relaying the Chief's orders for any additional equipment or man-power needed in fighting the fires.

Claimant also testified that in the instance of "multiple alarm" fires, which occurred "probably twice a month", he would "pitch in" and help the other firemen present "man the hose and fight the fire"; that this was what he was doing at the apartment house fire on January 2, 1973, when, after he had entered the burning apartment building several times, he was asked by the District Chief to go to his car and get a "self-contained [oxygen] mask." Claimant testified that when he got the mask and unsuccessfully tried to find the District Chief, he finally put the mask on himself while helping "man" the hose nozzle; that it developed the mask was not functioning; that the fire hose, with water in it, weighed several hundred pounds and he moved it short distances on occasion. Claimant further testified that after he had gone back into the building two or three times, and toward the end of his efforts, he got sick at his stomach, went out of the building and vomited, and was having arm and chest pains. Claimant further testified that Dr. P., the Fire Department physician, who goes out on multiple alarm fires, was present, but claimant did not tell him of his pains. Claimant further testified that there was no air in the apartment building, and Dr. P. advised him not to go back in it but he went anyway.

Claimant further testified that in all of the 18 years he had been with the Fire Department, he had never experienced the amount of work or exertion that he did at

that fire; that, after the fire, he drove the District Chief back to the fire station and told him that the fire was the worst one he had "ever made", that it affected him worse, and made him sick.

Claimant further testified that about the time he was ready for bed at the fire station that night, the pains in his chest and arms increased, but he worked the next regular shift and continued to work all of his regular shifts until he resigned.

Claimant further testified that during this latter period of almost four months, he worked other fires similar to the one of January 2nd, and had shortening of breath and pains in his arms and chest, but those fires were not as bad as the subject one, and his "problems" were "not as severe".

Claimant further testified that 29 days after he resigned, he was experiencing shortening of breath and wheezing, and one of his friends, who heard this, "highly recommended that I see a doctor—that something was wrong."

Claimant further testified that afterwards, when he went into an Oklahoma City hospital, where an E.K.G. was performed on him, was the first time he became aware that he had had a heart attack.

Claimant further testified that he has worked very little since leaving the City's Fire Department; that he is not able to do any type of work "without just completely being exhausted—giving out." He further testified that he is scheduled for open heart surgery.

On cross-examination, claimant testified, inter alia, that January 2, 1973, was the first time he had ever experienced any difficulty like chest and arm pains, but he had had shortness of breath under exertion "whenever I was fighting a fire." Claimant further testified that the alarm for the subject fire came in at 1:59 p. m., on January 2nd; that he was at that fire for "two to three hours", during a 24-hour shift that did not end until 7:00 o'clock the next morning, after which he was off duty for the following 24 hours. Claimant acknowl-

edged that this was not the first time he had become ill while fighting a fire, and he further stated, in substance, that from his experience the inhalation of smoke has a tendency to cause sickness of different types and he had noticed this in other firemen.

Claimant's further cross-examination established that the Fire Department had a "regular reporting process" that was supposed to be used when a fireman sustained an "on-the-job injury"; that in this process the injured was to make out a report over his signature and give it to his superior officer, who also was to sign it and take it to the main Fire Chief's office. Claimant was certain he had filled out such a report on a hernia he had suffered many years ago, which the City paid for, but he admitted he never made out such a report on his claimed injury of January 2, 1973.

According to claimant's testimony, Dr. Hu., who examined him on May 24, 1973, was the first doctor he saw about his claimed heart condition.

Claimant further testified on cross-examination that Dr. D., a psychiatrist, treated him, and it was recommended that he see Dr. P., who examined him on June 12, 1973, and recommended that he see a heart specialist. Claimant testified that the heart specialist he then went to was Dr. Ho. Apparently Dr. Ho. recommended a coronary bypass operation, which was to be performed by Dr. G. When respondent's counsel asked claimant what Dr. G. had told him about this type of surgery and why he had to have it claimant testified:

"He said the right artery was about ninety percent closed and that I had a left one . . . that was somewhere in the seventies * * *."

Claimant further testified that Dr. Ho. told him his heart was not getting enough blood. Later, in claimant's cross-examination, we find the following excerpts:

"Q Now, if you have had the shortness of breath in the last two years and

you've become physically ill at fires in the past, how do you pin point the 2nd of January as the exact date of your injury?

"A  Because that is the first time that I had this severe chest pains and arm pains. Before it was just . . . shortening of breath. I thought this was getting old and getting fat.

\*    \*    \*    \*    \*    \*

"Q  . . . Did you ever ask Dr. D————— when the . . . —alleged heart attack—occurred?

"A  Yes, sir.

"Q  What did he say?

"A  Well, I told him of the fire of January the 2nd and he said this could very possibly be—there was no way of him to know exactly the day or the moment that it happened by the E.K.G. \* \* \*"

The only medical evidence introduced to support the claim is Dr. P.'s report of his examination of the claimant on June 12, 1973. From the portion of this report headed "HISTORY PRESENTED BY THE PATIENT", it appears that the fire of January 2, 1973, and its effect on claimant, were described by claimant to Dr. P. essentially as noted in his testimony at the trial. After describing Dr. P.'s X-ray and laboratory findings, the report ended with the following conclusions:

"This 46 year old male patient shows evidence of a rather extensive posterior wall myocardial infarction. \* \* \* History indicates that the condition is related to his work. *I am unable to pin point a definite time as to when his injury to the heart occurred,* although *history indicates that he started having trouble* with the heart during a fire fight on January 2, 1973, and has had trouble since that time. The condition was further aggravated by a personal problem at the fire station resulting in his loss of

his job. Apparently this caused considerable psychic trauma and further aggravated the condition. In conclusion, it would therefore be my opinion that he is totally and permanently disabled for the purpose of performing ordinary manual labor, that the condition was either caused *or at least* aggravated *by his work as a fire fighter.* \* \* \*" [Emphasis added.]

The only other medical evidence in the record is a report by Dr. R., who, at the request of respondent's counsel, examined claimant on September 19, 1973. Dr. R.'s conclusions, as stated in this report, are as follows:

CONCLUSIONS: I am really not very impressed with the gravity of this patient's cardiovascular problem as evaluated from his history, physical examination, X-rays, electrocardiogram, etc. It is true that he is somewhat obese and has mild hypertension and is having prominent symptoms of fatigue and a feeling of breathlessness, but extensive discussion of the patient's symptoms with him does not bring out abundant evidence of chest pain. Furthermore, although his electrocardiogram showed the possibility of previous myocardial infarction, it was not very striking. Also, it appeared the whole matter was greatly colored by the emotional turmoil of his personal difficulties and administrative difficulties with the Department.

"Yet, on the other hand, an arteriogram was done by competent cardiologists who felt there was enough evidence of coronary narrowing to warrant bypass surgery, and this observation cannot be dismissed lightly. In view of this, I would have to say this patient probably does have coronary artery disease, and that possibly he has had a myocardial infarction in the past *at an unknown date.* The amount of disability he has at the present time is almost impossible to evaluate in view of his administrative dilemma, multiple medical observations and

treatment, and the impending surgical procedure.

"If the question has arisen as to whether his fire-fighting activities caused or accentuated his coronary artery disease, it is my opinion that they did not. *Coronary artery disease is caused by arteriosclerotic changes in the lining of the coronary vessels,* and *the natural progression of this disease often leads to* angina pectoris, *myocardial infarction,* or diffuse damage to the heart muscle, *irrespective of one's occupation."* [Emphasis added.]

■ One who seeks compensation for disability from a cardiac episode must establish by competent evidence that it was caused by an accidental injury in the course of his employment. Berryhill v. Prudential Premium Company of Okl., Okl., 394 P.2d 520. A myocardial infarction is of such a character as to require the testimony of medical experts to establish its cause or origin. In this connection, see Glaspey v. Dickerson, Okl., 350 P.2d 939. In this case, Dr. P.'s report does not establish that claimant's myocardial infarction was caused by any accidental injury which occurred January 2, 1973, as distinguished from being caused by "his work as a fireman" generally or from a pre-existing arteriosclerotic condition which respondent claimed, and Dr. R.'s report indicated, was its cause. We can therefore only hold that the Industrial Court's finding as to claimant's having sustained an accidental injury in the course of his employment on January 2, 1973, is without the necessary competent evidence to support it. Accordingly, the award must be vacated. Glaspey v. Dickerson, [3rd syll.], supra.

IRWIN, BERRY, HODGES and SIMMS, JJ., concur.

DAVISON, C. J., WILLIAMS, V. C. J., and LAVENDER and DOOLIN, JJ., dissent.